# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

PRESTON HOLLOW CAPITAL LLC,    )
                               )
            Plaintiff,         )
                               )
    v.                         )  C.A. No. 2019-0169-SG
                               )
NUVEEN LLC, NUVEEN             )
INVESTMENTS, INC., NUVEEN      )
SECURITIES LLC, and NUVEEN     )
ASSET MANAGEMENT LLC,          )
                               )
            Defendants.        )

## MEMORANDUM OPINION

Date Submitted:  January 8, 2020
Date Decided:  April 9, 2020

R. Judson Scaggs, Jr., Barnaby Grzaslewicz, and Elizabeth A. Mullin, of MORRIS NICHOLS ARSHT & TUNNEL, Wilmington, Delaware; OF COUNSEL: David H. Wollmuth, R. Scott Thompson, Michael C. Ledley, Sean P. McGonigle, William A. Maher, Nicole C. Rende, and Jay S. Handlin, of WOLLMUTH MAHER & DEUTSCH LLP, New York, New York, *Attorneys for Plaintiff*.

Peter J. Walsh, Jr., Jennifer C. Wasson, David A. Seal, and Robert J. Kumor, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; OF COUNSEL: Eva W. Cole, John E. Schreiber, Molly M. Donovan, Joseph A. Litman, and Mikaela E. Evans-Aziz, of WINSTON & STRAWN LLP, New York, New York, *Attorneys for Defendants*.

GLASSCOCK, Vice Chancellor

Plaintiff Preston Hollow Capital LLC ("Preston Hollow") and Defendants Nuveen LLC, Nuveen Investments, Inc., Nuveen Securities LLC and Nuveen Asset Management LLC (collectively, "Nuveen") are all institutional investors in municipal bonds. Preston Hollow and Nuveen are competitors in that market. Preston Hollow alleges that Nuveen tortiously contacted institutions that Preston Hollow had business relationships with, lied about Preston Hollow's business practices, and threatened to remove its considerable business from those institutions if they continued doing business with Preston Hollow. Nuveen denies that it made false representations about Preston Hollow.

In *Gulliver's Travels*, Swift puts Gulliver in contact with the Houyhnhnms, beings so moral and rational that they cannot comprehend the art of lying. They do not even have a word for the concept, and are forced to describe a lie as "the thing which is not." After hearing the testimony of some of Nuveen's witnesses, one might think they were such beings. Their circumlocutions for falsehoods—"hedge," "bluff," "exaggeration," "role-play," "scenario," "overstatement," "blustering," "short-cutting," "puff," "shorthand," "overblowing"—in situations where more quotidian creatures would simply say "lie," might make one doubt that the latter word is in their vocabulary. Their testimony was generally that institutional investors and their bankers speak in an argot of forceful misstatements that all parties involved know is posturing, so that no real untruth is conveyed. Perhaps. Far more

likely is that institutional investors, like the rest of us Yahoos, make statements of fact, true or false, with the intent to be believed. In this post-trial Memorandum Opinion, I find that Nuveen used threats and lies in a successful attempt to damage the Plaintiff in its business relationships. Accordingly, Nuveen is responsible for the tort of intentional interference with business relations. I find the equitable relief sought by Preston Hollow is unavailable, however.

My reasoning follows.

## I. BACKGROUND[1]

This is a post-trial Memorandum Opinion. The trial took place over two days, July 29 – July 30, 2019. The parties lodged 37 depositions and submitted 832 joint exhibits. The following facts were stipulated by the parties or proven by a preponderance of evidence at trial.[2]

*A. The Parties*

The Plaintiff, Preston Hollow, is a Delaware limited liability company.[3] Preston Hollow formed in 2014, and it operates as a finance company targeted at

---

[1] Citations to Joint Trial Exhibits ("JX") are expressed as JX __, at __. Page numbers for JXs are derived from the stamp on each JX page. Citations in the form "Trial Tr." refer to the trial transcript. Several key exhibits are recordings of phone conversations; these are cited by page and line like regular transcripts, e.g. JX __, at __:__.

[2] To the extent there was conflicting evidence, I have weighed the evidence and made findings based on the preponderance of the evidence. In pursuit of brevity, I sometimes omit from this Background discussion testimony in conflict with the preponderance of the evidence. In such cases, I considered the conflicted testimony, and I rejected it.

[3] *See* Joint Pre-Trial Stipulation and Order, D.I. 346 ("PTO"), ¶ 1.

investing in municipal finance.[4]  It operates nationwide.[5]  Currently, it has approximately $2.1 billion in assets and $1.3 billion in equity capital.[6]

Defendants Nuveen LLC, Nuveen Securities LLC, and Nuveen Asset Management LLC are Delaware limited liability companies.[7]  Defendant Nuveen Investments, Inc. is a Delaware corporation.[8]  As noted above, I refer to the Defendants, collectively, as "Nuveen."  Nuveen is a global asset manager, with municipal bonds forming a subset of its various asset classes.[9]  Nuveen has municipal fixed income assets under management of approximately $150 billion.[10]

Non-parties John Miller, Steve Hlavin, and Karen Davern are Nuveen employees.[11]

*B. The Municipal Bond Market*

1. A Municipal Bond Primer

Preston Hollow and Nuveen are both investors in the municipal bond market. Municipal bonds are debt securities issued by cities, counties, states, and other

---

[4] *Id.*

[5] *Id.*

[6] *Id.*

[7] *Id.* ¶¶ 2, 4–5.

[8] *Id.* ¶ 3.

[9] Trial Tr. 311:7–17 (Miller); JX 541, ¶¶ 63–64.

[10] PTO, ¶ 6.

[11] *Id.* ¶ 20.

3

governmental or non-profit entities to fund day-to-day obligations and to finance public works projects.[12] The vast majority of municipalities have some form of outstanding debt, and so the market is nationwide and vast.[13] The municipal securities market is valued at approximately $3.82 trillion, with approximately fifty thousand municipal issuers and one million unique securities.[14] One appeal of municipal bonds to investors is that the bonds usually pay interest that is exempt from federal, and sometimes state income taxes.[15] As in other securities markets, new bonds are issued on the "primary" market and then traded on the "secondary" market.[16]

Similar to other bonds, numerous qualities differentiate municipal bonds from one another; the identity of the issuer, credit rating, source of funds to service the debt, and the terms of the debt are all factors.[17] "Investment grade" bonds are those with a credit rating of BBB- or higher from Standard & Poor's or Fitch, or at least Baa3 by Moody's.[18] Generally, higher credit ratings indicate lower risk.[19] By

---

[12] *Id.* ¶ 7.

[13] JX 537, at 3; JX 541, ¶ 37.

[14] JX 537, at 3; JX 541, ¶ 37; Trial Tr. 47:8–18 (Metzold).

[15] PTO, ¶ 7.

[16] *Id.*

[17] *Id.* ¶ 10.

[18] *Id.* ¶ 11.

[19] *Id.*

contrast, high-yield municipal bonds carry higher default risks and by extension higher yields than their investment-grade cousins.[20] About ninety percent of municipal bonds are investment grade.[21]

Municipal bond issuances typically involve at least three parties: the issuer, the broker-dealer, and the investor.[22] The issuers (the supply side of the market) are municipalities—many municipal bond issuances seek to finance public works projects.[23] As the ultimate purchasers of the issuers' bonds, the investors (the demand side) finance these public works projects by purchasing the bonds.[24] Finally, broker-dealers act as intermediaries and assist in facilitating the issuance by providing services like marketing, pricing, underwriting, and closing.[25] Investors are numerous and run the gamut from individuals to sophisticated institutional investors like the parties in this case.[26]

In general, there are three different types of issuances: (1) public offerings, which are competitive and negotiated sales with multiple buyers; (2) limited public offerings, which are offers to a select number of investors who meet established

---

[20] Trial Tr. 48:12–24 (Metzold).

[21] *Id.* at 47:23–48:11 (Metzold).

[22] PTO, ¶¶ 7, 9.

[23] *Id.* ¶ 7; Trial Tr. 533:11–534:2 (Snyder).

[24] Trial Tr. 533:13–534:2 (Snyder).

[25] JX 541, ¶¶ 51–53; Trial Tr. 534:5–11 (Snyder); PTO, ¶ 9.

[26] JX 541, ¶ 48.

standards as qualified purchasers, and (3) private placements, which are placed directly with an investor without the use of an underwriter.[27] When a single investor buys the entirety of a bond's primary issuance, it is called a "100% placement" transaction.[28] I refer to these throughout simply as "100% placements." A 100% placement can be done in a public or private issuance.[29] Issuing bonds to a single investor can offer advantages in terms of financing flexibility, which makes 100% placements attractive to certain issuers.[30] On the other hand, because a single investor in a 100% placement purchases all the bonds, such a transaction may lack the same degree of competitive market check a wider issuance would enjoy.[31]

An issuer may engage broker-dealers as investment bankers to facilitate the issuance of its municipal bonds.[32] The broker-dealer can serve as intermediary between the issuer and prospective investors.[33] In public offerings, a broker-dealer also acts as an underwriter to orchestrate the transaction and ensure proper due

---

[27] PTO, ¶ 13.

[28] Trial Tr. 52:13–53:4 (Metzold).

[29] *Id.* at 52:13–53:12 (Metzold).

[30] *See*, *e.g.*, *id.* at 84:7–90:17 (Albarran), 501:1–9 (Harris).

[31] *E.g.* JX 224, at 63–64 (Preston Hollow noting in an agreement for a 100% placement that "the terms . . . including the price, were determined pursuant to a negotiation . . . [t]here will be no market clearing rate for the [bonds]").

[32] PTO, ¶ 9.

[33] *Id.*

diligence.[34]  Having a top-tier underwriter can increase the attractiveness of the issue by lending credibility to the transaction and thus increasing the marketability of the bonds.[35]  A broker-dealer acting as an underwriter has a duty to the issuer under rules of the Municipal Securities Rulemaking Board (MSRB) to purchase bonds at a price that is fair and reasonable to the issuer and to sell the securities at a price that is fair and reasonable to the investor.[36]

The typical municipal bond trader lives in the fast-paced world of finance, where a trader requires rapid communication, strong relationships, and the ability to move quickly to succeed.[37]  One tool municipal bond traders use to leverage desired actions is to express displeasure by putting another party or entity "in the box."[38]  This bond-trader colloquialism is well-known in the industry, and both Nuveen and Preston Hollow use it regularly.[39]  A broker-dealer can also put a trader or other

---

[34] Trial Tr. 51:17–52:3 (Metzold).

[35] *Id.* at 51:12–53:12 (Metzold).  Certain of Metzold's testimony, including testimony on this issue, was the subject of a Motion *in Limine* from Nuveen, dealt with below.

[36] JX 541, ¶ 52.

[37] Trial Tr. 377:22–380:4-14 (Davern).

[38] *Id.* at 386:10–387:2 (Davern) ("Q: Why would you use the phrase 'in the box'? A: Sometimes it means something.  Sometimes it doesn't mean something . . . you've probably done something to make me mad, to make us mad. . ."); Sorenson Dep. at 58:25–59:2 ("It's my opinion that it's the ability to politely say we're unhappy.").

[39] Trial Tr. 386:12–15 (Davern), 588:7–14 (Costello), 30:7–21 (Thompson).  The etymology is uncertain. *See Cool Hand Luke* (Warner Bros. 1967) (Carr the Floorwalker explains the camp rules).

counterparty in the box.[40] At its most basic, it is simply a way for a party to leverage action.[41] Being "in the box" has no official repercussions and so can be used somewhat casually.[42] At the same time, being "in the box" can lead to more serious consequences, such as a temporary cessation of business between parties.[43]

### 2. Nuveen's and Preston Hollow's Place in the Municipal Bond Market

Both Nuveen and Preston Hollow purchase municipal bonds, including high-yield bonds, on the primary market and trade them on the secondary market.[44] But the parties operate under distinct business structures. Preston Hollow styles itself as a "bespoke solution provider" that custom-designs its deal structures to lend flexibility and security to issuers through 100% placements.[45] Preston Hollow's business and finance model are relatively unique and new in the municipal bond market.[46] The majority of Preston Hollow's financing deals are 100% placements.[47]

---

[40] *E.g.*, Trial Tr. 583:18–584:12 (Chang).

[41] Sorenson Dep. at 55:4–13 ("It's a relationship tool"); Trial Tr. 338:5–9 (Miller) ("Q: In your experience, has telling someone that they're in the box influenced their behavior? A: Sometimes it does and sometimes it doesn't.").

[42] *E.g.* Trial Tr. 584:24–585:8 (Jentis), 388:18–389:5 (Davern).

[43] *E.g. id.* at 584:22–585:8 (Jentis).

[44] PTO, ¶ 12.

[45] Trial Tr. 15:22–16:24, 17:11–19 (Thompson), 83:5–90:17 (Albarran).

[46] Haskell Dep. at 29:13–20 ("There [are] not a lot of people that have Preston Hollow's business model. It is somewhat new to the municipal marketplace . . . it's new and it's something that the market is digesting"); *see also* JX 189, at 8; JX 935, at 2.

[47] Trial Tr. 28:2 – 22 (Thompson). Preston Hollow does "[m]ostly primary" bond issuances, and of those primary issuances, it only "[o]ccasionally" purchases something less than 100% of the

It employs a permanent capital model that permits it to provide flexible financing solutions.[48] Most of its transactions come to it through its broker-dealers, although it also originates deals on its own that it takes to broker-dealers to partner.[49] It has approximately $2.1 billion in assets and $1.3 billion in equity capital.[50]

Nuveen has approximately $150 billion in municipal assets, with $27 billion in high-yield municipal bond funds.[51] Several employees testified that it is "the largest high-yield [municipal] fund in the world."[52] Nuveen's model, in contrast with Preston Hollow's permanent capital financing, is a mutual fund, which requires liquidity to absorb the inflows and outflows of cash as investors withdraw or deposit in the fund.[53] When there are inflows, Nuveen seeks new bond issuances to invest the cash.[54] Therefore, the opportunity to purchase new issuances in the primary market—in municipal bond parlance to "see deals"—allows Nuveen to meet market

---

issuance. *Id.*; *see also id.* at 79:18–80:3 (Albarran), 439:20–440:12 (Weiner). Preston Hollow also manages other investments as a smaller profile part of its business. *Id.* at 28:17–29:6 (Thompson).

[48] *Id.* 85:4–15 (Albarran). Among the features Preston Hollow offers are initial commitment, interim financing, "draw down" bonds (i.e. guaranteed funding through incremental as-needed purchases of bonds), rate locks, waiver of reserve funds, and post-closing changes to financing terms. *Id.* at 83:22–90:17 (Albarran).

[49] *Id.* at 82:10–17 (Albarran), 441:15–24 (Weiner).

[50] PTO, ¶ 1.

[51] *Id.* ¶ 6; Trial Tr. 57:14–58:1 (Metzold).

[52] Trial Tr. 237:7–9 (Miller); JX 263, at 17:24–18:1.

[53] Davern Dep. at 39:17–19; Trial Tr. 85:4–19 (Albarran).

[54] Davern Dep. at 43:10–44:24; Trial Tr. 388:12–17 (Davern).

demand.[55]   As a result, in evaluating broker-dealers for partnering, Nuveen consistently rates "seeing deals" as the most important factor in the relationship.[56] As a smaller subset of its business, like Preston Hollow, Nuveen will also structure high-yield municipal bonds directly with issuers and engage in 100% placements.[57]

When Preston Hollow conducts 100% placements, it funds the entire issuance, and consequently Nuveen does not "see" these deals before the bonds reach the wider market.[58]  This lessens Nuveen's ability to meet market demand because it diminishes the array of purchase options available to it.[59]

In the fall of 2018, Preston Hollow engaged in several transactions important to this litigation.  On September 26, 2018, Preston Hollow closed an approximately $196 million bond issuance with Roosevelt University, located in Chicago, Illinois.[60] Wells Fargo served as underwriter for the transaction.[61]   Roosevelt University required a refinancing of existing debt within ninety days to relieve financial distress.[62]  Nuveen had previously purchased bonds from Roosevelt University.[63]

---

[55] Trial Tr. 388:12–17 (Davern), 321:18–322:5 (Miller).

[56] JX 111, at 1.

[57] Trial Tr. 313:5–10, 317:19–318:23 (Miller).

[58] *Id.* at 392:1–393:10 (Davern).

[59] *Id.* at 389:15–391:4 (Davern).

[60] PTO, ¶ 16.

[61] *Id.*

[62] Trial Tr. 492:8–24 (Harris).

[63] PTO, ¶17; JX 263, at 4:10–13; Trial Tr. 498:7–499:6 (Harris).

Later that fall, Preston Hollow closed another deal, investing approximately $33.2 million in municipal bonds issued by Howard University, located in Washington D.C. (the "Howard Center" transaction), to fund construction of student housing.[64] Bank of America Merrill Lynch ("BAML") served as underwriter for the transaction.[65] Because both deals were 100% placements, Nuveen was unable to participate in either bond issuance.[66]

### C. Nuveen's Efforts Against Preston Hollow and 100% Placement Transactions

Nuveen's opposition to Preston Hollow and its business model focusing on 100% placements began as early as August 2017, when Preston Hollow was first emerging as a serious player in the high-yield bond market.[67] Even at that time, in an internal chat, Nuveen's Chief Investing Officer John Miller described broker-dealers working with Preston Hollow as "stab[bing] us in the back" and suggested his stance to broker-dealers would be that "if you want to build your business around Preston [Hollow], go ahead, but don't think you can ever call us again."[68]

---

[64] PTO, ¶ 18; JX 224, at 8–9.

[65] PTO, ¶ 18.

[66] *See id.* ¶ 19.

[67] *See* JX 79, at 1 (Chief Investing Officer Miller describing plans to impose choice on broker-dealers between doing business with Nuveen or Preston Hollow); *see also* JX 81, at 1 (Davern and Stifel representative discussing in August 2017 "how to keep [Preston Hollow] from getting more and more of the [high-yield] market.").

[68] JX 79, at 1.

This dispute, however, largely centers on the time period between December 2018 and February 2019, when Nuveen employees, led by Miller, held a series of phone calls and meetings with various broker-dealers as well as with Deutsche Bank ("Deutsche").[69] During that time, Nuveen employees discussed Preston Hollow and the 100% placement model with Deutsche, BAML, Goldman Sachs ("Goldman"), JPMorgan Chase & Co. ("JPMorgan"), Mesirow Financial ("Mesirow"), Morgan Stanley ("Morgan"), RBC Capital Markets ("RBC"), Stifel Nicolaus ("Stifel"), and Wells Fargo.[70] In addition, Nuveen had previously discussed Preston Hollow with KeyBanc Capital Markets ("KeyBanc") in April 2018.[71]

The entities listed above had all conducted business with Preston Hollow in the past, though not all of them had conducted 100% placements. The calls with Deutsche, Goldman, Morgan, and RBC were recorded.[72] Below, I recite the facts regarding each third party's communications with Nuveen and its relationship with Preston Hollow separately.

1. Deutsche

Deutsche is Preston Hollow's primary lender, including its source of tender offer bond financing ("TOB financing"), a common method of financing

---

[69] PTO, ¶ 20.

[70] *Id.*

[71] Moriarty Dep. at 40:4–19; JX 123.

[72] PTO, ¶ 21.

investments in municipal bonds.[73] Deutsche financed the Roosevelt University and Howard Center transactions described above.[74] On December 20, 2018, Miller informed his team that if Deutsche provided TOB financing to Preston Hollow for the Howard Center issuance, Nuveen would remove its business from Deutsche.[75] That same day, Hlavin called Deutsche and stated that Nuveen "will not be conducting high-yield business with anyone who is involved in these types of transactions [i.e. 100% placements] with Preston Hollow."[76] Hlavin represented on this phone call that Nuveen was "going to every single bank and broker-dealer" that day, and that "the policy going forward is that if you are doing – if you are actively doing business with [Preston Hollow], Nuveen will not be doing business with you."[77] At trial, Hlavin testified that he did not intend his words to be taken seriously, but that he needed to "make exaggerated statements" to "strengthen [his] position."[78] Hlavin testified that when he referenced Preston Hollow, he was "short-handing" for 100% placement transactions.[79]

---

[73] Trial Tr. 430:10–13 (Weiner), 139:22–140:7 (Hlavin); PTO, ¶ 15.

[74] Trial Tr. 430:10–13 (Weiner), 140:16–141:5 (Hlavin).

[75] JX 305, at 2 (Miller writing "If [Deutsche] TOB's Howard University student housing for [Preston Hollow], we will be taking our business with them to $0 as soon as practicable.").

[76] JX 263R, at 7:4–7.

[77] *Id.* at 24:21–25:2.

[78] Trial Tr. 149:7–17 (Hlavin).

[79] *Id.* at 184:23–185:6 (Hlavin).

In addition to this "devastating" ultimatum,[80] Hlavin represented to Deutsche on this call that Preston Hollow lied to issuers by misrepresenting things about Nuveen.[81] Hlavin said Preston Hollow was "demonstrating predatory lending practices" toward borrowers and would "take [the borrowers] into bankruptcy."[82] In a second call with Deutsche later that day, Hlavin claimed he possessed "direct evidence" of Preston Hollow's lies, though it is apparent from his testimony that he based this statement on what he overheard at Nuveen's trading desk.[83] At trial, Hlavin testified that he did not need to verify his allegations because he was "role playing" to "build a position" and "challenge someone in debate."[84]

On December 21, 2018, Miller also called Deutsche.[85] In that call, Miller stated that he had a "firm commitment" from Wells Fargo, BAML, Goldman, and JPMorgan to "never do business with Preston Hollow again."[86] At trial, Miller testified that he exaggerated these statements; by "firm commitment," he meant the

---

[80] *See* JX 263R, at 25:2–7 (Hlavin and Deutsche representative agreeing "[This is] devastating news"; "It's devastating news"; "It's devastating.").

[81] *Id.* at 29:2–14 (Hlavin stating Preston Hollow is "just sitting in front of issuers lying to them . . . directly bashing Nuveen to the issuer.").

[82] *Id.* at 4:17–5:2, 7:18–8:5.

[83] JX 393R, at 8:11–9:8; Trial Tr. 186:23–187:20 (Hlavin) (testifying, "I overhead it on the desk, and that was enough to give me concern to go to Deutsche Bank about my concerns").

[84] Trial Tr. 156:20–158:15 (Hlavin).

[85] JX 310R.

[86] *Id.* at 4:15–5:7.

broker-dealers "were going to look into their private versus public practices."[87] He testified he "was overstating, shortcutting, and blustering a little bit to try and get their attention."[88] Miller did not consider these statements to be problematic, as he testified that in the high-yield municipal bond market, other parties "[are] blustering and exaggerating to me. And I'm blustering and exaggerating back to them. And we kind of know what's going on."[89]

Additionally, Miller represented that Preston Hollow conducted unethical business practices, or "dirty deals."[90] He informed Deutsche that Roosevelt University "got fleeced" by Preston Hollow based on the yield on the bonds in that transaction.[91] Like Hlavin, he labeled Preston Hollow's lending practices "predatory."[92] He claimed it "rushed" broker-dealers through deals without allowing for proper evaluation.[93]

---

[87] Trial Tr. 287:2–9 (Miller) (Miller testifying "I exaggerated the nature of those conversations that happened with those other firms . . . [i]t was not that type of commitment.").

[88] *Id.* at 291:17–23 (Miller).

[89] *Id.* at 337:3–7 (Miller).

[90] JX 310R, at 8:6–9 (Miller stating, "[i]t's an . . . ethical behavior firm versus . . . the opposite"), 31:14–32:14, 21:9–13 (Miller stating, "some of these dirty deals are going to become less financeable").

[91] *Id.* at 4:5–14.

[92] *Id.* at 2:18–3:1 (Miller stating, "the deals are not coming at market levels because of the predatory nature of the way in which they're pitched and prepackaged between Preston [Hollow] and the issuer.").

[93] *Id.* at 23:1–7.

Miller informed Deutsche that he would reduce Nuveen's TOB business by $300 million with further reductions to come as a result of Deutsche's business relationship with Preston Hollow.[94] To date, Nuveen has reduced the amount of its TOB financing with Deutsche by $1 billion, from $1.9 billion to $900 million.[95] Nuveen represented it reduced its TOB financing for business reasons related to counterparty risk.[96] An additional motive in reducing its TOB financing with Deutsche was ultimately to cut off Preston Hollow's access to financing in general.[97] Deutsche has not withdrawn financing from Preston Hollow.[98] Deutsche affirmed its intent to continue to provide financing and has renewed all relevant financing contracts.[99]

---

[94] *Id.* at 23:24–26:3; Sorensen Dep. at 284:5–285:12.

[95] Trial Tr. 227:15–20 (Hlavin).

[96] *Id.* at 225:18–228:7 (Hlavin). In simplified form, Nuveen argued that because Deutsche mixed bonds from various high-yield investors in its TOB trusts, Preston Hollow's higher risk bonds damaged the overall performance of the TOB trust, thereby necessitating Nuveen's withdrawal. *Id.*

[97] *See* JX 310R, at 11:5–12:20 (Miller stating to Deutsche representative, "who else are they going to get financing from when Wells Fargo, Goldman, JPMorgan, BAML, and Citi have . . . agreed to . . . not do this business anymore? I don't know where they're going to get the financing from."), 17:13–16 (Miller stating, "[b]ut where are they getting the money to do the predatory lending? I think you're – I think you're far and away number one"), 21:9–13 (Miller stating, "some of these dirty deals are going to become less financeable, in my opinion. That's my effort. That's my goal, one of my goals, just so you know."); *see also* Van Den Handel Dep. at 44:1–48:20, 72:9–73:11 (Van Den Handel testifying that Miller was "clearly saying that those firms listed will not provide financing, and the implication is that . . . there isn't a significant player out there who can do it in their absence.").

[98] Trial Tr. 355:14–24 (Van Den Handel).

[99] *Id.* at 356:12–357:3 (Van Den Handel); JX 509, at 1–2.

16

## 2. BAML

BAML served as underwriter for Preston Hollow's Howard Center transaction, which closed on November 28, 2018.[100]  On December 20, Davern called BAML and placed it in the box for its role as underwriter in the Howard Center transaction.[101]  Miller later told Davern that if BAML was financing Preston Hollow, he would not "even speak for BAML for 2019 for BBB and below" (i.e. high-yield bonds).[102] That same day, Miller also spoke on the phone with another BAML representative.[103]  On that call, Miller shared "research" regarding Preston Hollow and asked that BAML not conduct 100% placements without making the deals publicly available.[104]

The following day, BAML conducted internal discussions, and it agreed that going forward it would not participate in 100% placements without a public

---

[100] *See* JX 224.

[101] JX 299R, at 4:13–22 (Davern stating in phone conversation, "BAML . . . is in the box effective today as a result of a deal"); JX 310R, at 5:1–7 (Miller stating in phone conversation, "we stopped doing business with [BAML] temporarily"); *see also* JX 271R, at 2:8–16; Davern Dep. at 270:14–24; Chang Dep. at 57:13–58:24.  Both BAML representatives later testified not recalling if they were "in the box," but contemporaneous email correspondence from the BAML representative to Miller on December 20, 2018 stated that Davern "made it very clear we are in the 'box' with you guys."  JX 308, at 1.

[102] Trial Tr. 374:14–375:14 (Davern).

[103] JX 308, at 1; Jentis Dep. at 62:15–63:2.

[104] Jentis Dep. at 68:17–70:3; Miller Dep. at 277:8–278:19.

17

offering.[105]  A BAML representative communicated the new policy to Miller.[106] Though this new policy was purportedly a general response to the market, the Howard Center transaction served at the impetus.[107]  However, it also appears that Preston Hollow sought to replace BAML as underwriter for a follow-on transaction due to issues with the BAML representative on the previous Howard Center transaction.[108]  BAML has not engaged in any 100% placements with Preston Hollow since its role in the Howard Center transaction.[109]

### 3. Goldman

Prior to December 2018, Preston Hollow had never completed a 100% placement with Goldman.[110]  However, the two parties had a business relationship: Goldman had expressed interest in serving as underwriter to the Howard Center transaction before it was awarded to BAML, and as of late 2018, Goldman was in discussion with Preston Hollow regarding twelve potential transactions.[111]  The record does not reflect the stage of each of these potential transactions, though at

---

[105] Jentis Dep. at 70:11–74:15, 79:2–10, 83:22–84:24.

[106] *Id.* at 83:22–84:10.

[107] *Id.* at 83:22–84:17 (Jentis testifying, "the Howard [Center] deal was the example, the impetus for [the change in policy]").

[108] *See* JX 484, at 2.

[109] Jentis Dep. at 93:22–94:12.

[110] Trial Tr. 470:11–16 (Weiner).

[111] *Id.* at 477:9–23 (Scruggs), 20:1–18 (Thompson), 94:22–96:6 (Albarran), 422:8–18 (Weiner); Scruggs Dep. at 54:12–58:21.

least some of them were still in early, speculative form.[112] Goldman generally considered Preston Hollow a potential partner and a "portion of [its] continued business plan."[113]

On December 21, Miller called his contact at Goldman.[114] After discussing Preston Hollow's growth as a company, Miller said that "to be a partner with Nuveen . . . you can't do any of this private bullshit business with Preston Hollow."[115] He also stated that Goldman would "have to choose who [it does] business with. Because I don't want to do business with those firms that do business with Preston Hollow."[116] At trial, Miller testified this was "a very blustery introduction . . . to get his attention."[117] He also testified that referencing Preston Hollow was only "a shortcut" to discuss 100% placements.[118] Miller represented to Goldman that he had "five dealers so far" in agreement not to do business with Preston Hollow, and that

---

[112] *E.g.* Scruggs Dep. at 28:21–29:6 (Scruggs testifying, "[t]here is no transaction at this time . . . LAX doesn't even know if they have a project yet.").

[113] *Id.* at 64:20–25 (Scruggs testifying, "[w]e are actively engaged with [Preston Hollow] on multiple potential projects and they represent a portion of our continued business plan.").

[114] JX 267R.

[115] *Id.* at 6:13–7:2.

[116] *Id.* at 22:9–18.

[117] Trial Tr. 247:17–248:3 (Miller).

[118] *Id.* at 248:4–12 (Miller).

he would be attempting to get more.[119] Again, at trial, Miller testified regarding this purported agreement that he was "exaggerating a little . . . to get a reaction."[120]

In addition, Miller told Goldman that Preston Hollow lied to issuers.[121] He told Goldman that issuers fell for Preston Hollow's "predatory practices" after hearing its "predatory sales pitch."[122] He also stated that "issuers are being told things that are not true," and that Preston Hollow would "rush the issuer into" unfair or suspect transactions.[123] He proffered that he had "a lot of evidence" to support the allegations.[124] Attempting to put some of this evidence forward, Miller told Goldman that multiple states' attorneys general had contacted Preston Hollow over "unethical practices," sent it "nastygrams," and told it, "[d]on't come into my town again."[125] Miller based this allegation on a letter from a single city attorney that suggested one of Preston Hollow's transactions might not meet state attorney general

---

[119] JX 267R, at 33:23–34:3.

[120] Trial Tr. 276:23–277:5 (Miller).

[121] JX 267R, at 19:10–16 (Miller stating in phone conversation, "issuers are being told things that are not true."), 42:3–4 (Miller stating, "[w]hat did Preston Hollow tell that issuer? It wasn't the truth"); *see also* Trial Tr. 263:2–264:24 (Miller).

[122] JX 267R, at 17:11–20, 31:21–32:22.

[123] *Id.* at 44:2–12; 19:10–20:3.

[124] *Id.* at 21:1–5.

[125] *Id.* at 20:4–19.

requirements with regard to a bond issue.[126] Miller testified the dissonance presented by his allegation and his evidence was "a little bit of a shortcut."[127]

Following this call, an internal email circulated at Goldman discussing the phone conversation and noting Miller's message that "he is going around to all the major dealers who cover him and let them know that if they do business with Preston Hollow then Nuveen will not do business with them."[128] Goldman representatives met with Miller on January 22, 2019.[129] At that meeting, Miller reiterated Nuveen's position that if Goldman did business with Preston Hollow, Nuveen would not do business with Goldman.[130]

Beginning in late January, following the meeting with Miller, Goldman began to develop internal "boundaries"—a "matrix"—to evaluate whether to underwrite 100% placements.[131] Goldman's representative testified that the discussions with Miller prompted the creation of this matrix.[132] The "matrix" remains under

---

[126] Trial Tr. 270:1–14 (Miller).

[127] *Id.* at 270:20–22 (Miller).

[128] JX 293, at 2.

[129] Scruggs Dep. at 81:21–23.

[130] Trial Tr. 480:23–481:11 (Scruggs); Scruggs Dep. at 85:4–15.

[131] Scruggs Dep. at 41:16–45:23.

[132] Trial Tr. 485:20–486:44 (Scruggs) (Scruggs testifying, "Nuveen's threat or comment or call, whichever you'd like to refer them, absolutely spurred us to look at these types of transactions and to put together potential boundaries under which we would be comfortable moving forward with the whole general category of limited public offering single purchaser transactions").

review.[133]  In the meantime, Goldman has declined to move forward with any of the twelve transactions in discussion as of December 2018 and is not currently in discussion about any future deals.[134]  Despite its previously expressed interest, Goldman also declined to serve as an underwriter for Preston Hollow's 2019 follow-up transaction with Howard University (the "Howard Quad" transaction), citing concerns with the timeline and difficulty "in terms of filling out the matrix" it had developed internally to evaluate 100% placements.[135]

### 4. JPMorgan

Prior to December 2018, JPMorgan had not completed any 100% placements with Preston Hollow.[136]  The two parties, however, had a developing business relationship: internal communications suggest JPMorgan intended to develop business with Preston Hollow.[137]  On or around November 20, 2018, JPMorgan sent a request to be considered to finance the upcoming Howard Quad transaction.[138]

On or around December 20, Miller called his contact at JPMorgan.[139]  Miller discussed Nuveen's disapproval of broker-dealers engaging in 100% placements, in

---

[133] *Id.* at 481:12–19, 485:16–486:4 (Scruggs); Scruggs Dep. at 35:4–14; 102:13–104:3, 105:5–11.

[134] Trial Tr. 483:6–16 (Scruggs), 98:8–11 (Albarran).

[135] Scruggs Dep. at 101:2–101:10; Trial Tr. 482:5–19 (Scruggs).

[136] Trial Tr. 471:23–472:5 (Weiner).

[137] JX 180, at 1.

[138] JX 217, at 1.

[139] O'Loughlin Dep. at 36:9–14.

particular the Roosevelt University transaction.[140]  Miller then inquired about JPMorgan's process for evaluating and engaging in transactions.[141]  When Preston Hollow contacted JPMorgan in February 2019 to move forward with the Howard Quad transaction, JPMorgan declined to serve as underwriter, despite its prior solicitation.[142]  It cited concerns with adequate time to secure internal approvals and potential interference with Howard University's existing relationship with BAML, who financed the Howard Center transaction.[143]  Preston Hollow inquired about a reasonable length of time that would permit the needed approvals, but JPMorgan declined to offer a specific timeline.[144]

### 5. KeyBanc

Prior to December 2018, KeyBanc had completed four 100% placements with Preston Hollow.[145]  In April 2018, Davern called KeyBanc and placed it in the box—effectively ceasing to do any business with it—for a recent 100% placement with Preston Hollow.[146]  Also as a response to KeyBanc's work with Preston Hollow,

---

[140] *Id.* at 36:21–39:4.

[141] *Id.* at 38:19–39:4.

[142] JX 484, at 1–2.

[143] *Id.* It appears that Preston Hollow sought to replace BAML as underwriter due to issues with the BAML representative on the previous Howard Center transaction. *See id.* at 2.

[144] *Id.* at 1–2; Trial Tr. 419:10–422:7 (Weiner).

[145] *See* Weiner Dep. at 90:18–25, 105:6–15, 106:11–18; Levin Dep. at 161:23–162:5.

[146] Moriarty Dep. at 40:4–19; JX 123, at 1 (KeyBank Representative stating in internal email that Davern called, and that "Nuveen will not do any more municipal business with [KeyBanc] . . . this call is a direct response to the 125mm El Centro deal that we placed privately last week.  John

Nuveen withdrew a purchase order on an $85 million issuance for which KeyBanc was acting as underwriter.[147] KeyBanc made a commitment in the summer of 2018 to show Nuveen every deal, and after that commitment Nuveen and KeyBanc resumed business.[148]

KeyBanc continues to underwrite 100% placements that Preston Hollow originates, but it has not originated any 100% placements for Preston Hollow.[149] In addition, to stay out of the box, all 100% placements are initially shown to Nuveen.[150]

### 6. Mesirow

Prior to December 2018, Mesirow had not completed any 100% placement deals with Preston Hollow; however, as of December, the parties were working together on six 100% placements.[151] Five of these deals, referred to as the "Hutto dirt deals," were to take place in Texas.[152]

---

Miller who runs the department has determined that they will not do any business with us at all, until at least late August. And they will only resume activity once they have been assured we will no longer place deals privately.").

[147] JX 123; Moriarty Dep. at 55:13–56:11.

[148] Moriarty Dep. at 56:18–59:6.

[149] Trial Tr. 425:8–21, 443:11–16 (Weiner); Czajkowski Dep. at 41:2–42:25, 64:10–65:24, 71:2–73:25.

[150] Trial Tr. 443:11–16 (Weiner); Moriarty Dep. at 58:7–25.

[151] Trial Tr. 20:19–21:5 (Thompson), 418:17–419:9, 424:21–425:7 (Weiner).

[152] *Id.* at 20:19–21:5 (Thompson).

There is no direct evidence of a communication between Nuveen and Mesirow, but Miller told Deutsche that he had Mesirow "onboard with our . . . procedures on . . . a going forward basis."[153]  Additionally, Hlavin informed Deutsche that Nuveen was responsible for blocking the "five dirt deals out of Texas."[154]  This matches testimony from Preston Hollow that one week before the first of the Hutto deals was set to close, Mesirow "threw up some issues they knew would not be acceptable" related to credit committee approval, and as a result Preston Hollow terminated Mesirow's role in the transaction.[155]  Preston Hollow did not close any of the six transactions underway in December 2018 with Mesirow, and Mesirow has not brought any transactions to Preston Hollow since.[156]  Preston Hollow, however, has since closed or is moving toward closing the same deals with other partners.[157]

---

[153] JX 310R, at 7:12–16.

[154] JX 393R, at 2:14–3:6.  At trial, Hlavin testified that "[a]t the time that I made that call . . . I think I was referring to Wells Fargo."  Trial Tr. 189:5–10 (Hlavin).  I find it more likely, given that Mesirow was involved in five "Hutto dirt deals" in Texas with Preston Hollow, and that Wells Fargo had no similar transactions pending, that Hlavin was referring to communications with Mesirow, and that he either blocked or attempted to block those transactions.

[155] Trial Tr. 445:13–23 (Weiner).

[156] *Id.* at 424:21–425:7, 418:17–419:9 (Weiner), 20:19–21:5 (Thompson).

[157] *Id.* at 449:2–11 (Weiner); Albarran Dep. at 93:19–97:9.  Albarran testified he did not believe the changes in partnering the Hutto deals resulted in any changes in the deal terms.  Albarran Dep. at 101:8–13.

### 7. Morgan

During 2017 and 2018, Morgan conducted two 100% placements with Preston Hollow.[158] On December 20, Davern made three phone calls to Morgan representatives.[159] Davern told them that Morgan was in the box for its work on a 100% placement with Preston Hollow, and that Nuveen would not do business with Morgan if it continued to do 100% placements with Preston Hollow.[160] Davern informed Morgan that Miller was "building a book of dealers" that would not engage in Preston Hollow's private financing deals, and that if Morgan was "going to do that kind of business, we will not be doing business with you."[161] Davern added that Miller was "infuriated by Preston Hollow's way of doing business," and that Preston Hollow were "bad people."[162] Davern noted that Nuveen would make the requirement "uniform across the street," first because "muni debt . . . is being removed from [Nuveen's] ability to buy it," and also because Nuveen believed 100% placements were "not right for the municipal bond business in general."[163]

---

[158] Trial Tr. 419:1–3 (Weiner); JX 388, at 1–2.

[159] JX 271; JX 277; JX 299.

[160] JX 299R, at 4:4–5:24 (Davern stating in phone call, "you're in the box right now if you list out every single deal you have done with Preston Hollow. We will not do high-yield business with MorganStanley. This is how serious this is."); *see also* Costello Dep. at 39:3–41:24, 45:6–47:9.

[161] JX 277R, at 2:19–3:11, 4:21–5:6.

[162] *Id.*

[163] JX 299R, at 10:20–11:11 (Davern stating in phone call, "[i]t's going to be uniform across the street."), 6:20–24 ("[Preston Hollow is] going and sourcing muni debt that is being removed from our ability to buy it and your bankers are saying, yes, let's do it. . ."); JX 277R, 2:19–3:5.

According to Davern, other broker-dealers—specifically BAML and Citibank—had already been put "in the box" or "straightened out" for participating in 100% placements with Preston Hollow.[164] Further communications between Nuveen and Morgan during late December 2018 and January 2019 cleared the air, and the two parties resumed ordinary business after the holidays.[165]

In late December 2018, Morgan and Preston Hollow were working toward the close of an issuance dubbed the "Rixey deal."[166] Although Preston Hollow testified that Morgan "kicked [them] out of the Rixey deal," it appears that the issuer terminated Preston Hollow for issues specific to the transaction and unrelated to Nuveen.[167] Morgan has not engaged with Preston Hollow in any 100% placements since.[168]

### 8. RBC

In 2017, RBC conducted approximately $14.5 million worth of 100% placements with Preston Hollow.[169] In 2018, that number declined to $127,971.[170] On January 9 and 11, 2019, Davern and Miller conducted two phone calls with a

---

[164] JX 299R, at 4:13–22, 10:20–11:11.

[165] Haskel Dep. at 83:8–21, 108:8–114:14.

[166] *Id.* at 50:3–22.

[167] Trial Tr. 422:19–24 (Weiner); Haskel Dep. at 56:8–20, 107:11–108:7.

[168] Haskell Dep. at 166:5–12; Trial Tr. 422:19–24 (Weiner).

[169] JX 740, at 1.

[170] *Id.*

27

representative at RBC.[171]   Davern informed RBC of Nuveen's new policy "about how [the major broker-dealers] have to stop doing this business" and indicated that Nuveen had "turned around" dealers who did 100% placements previously but "would never do it again."[172]   The RBC representative stated that he had fought against 100% placements for three years, provided information on deals between Preston Hollow and other broker-dealers, including Stifel, and after the phone calls in January continued to provide information on Preston Hollow deals.[173]   Since January 2019, RBC has continued to do business with Preston Hollow, including working on a 100% placement.[174]

### 9. Stifel

Prior to December 2018, Stifel had completed several 100% placement deals with Preston Hollow, including deals that Stifel originated.[175]   In October 2018, Davern met with Stifel representatives and indicated that Nuveen would consider curtailing business if Stifel failed to show it every transaction.[176] Late in 2018, Stifel

---

[171] JX 383R; JX 396R.

[172] JX 396R, at 2:4–12; 5:13–20.

[173] JX 383R, at 28:24–31:6; *see also* JX 450; JX 452.

[174] Trial Tr. 437:15–438:12 (Weiner); Hummel Dep. at 608:12–15.  The parties disagree on the nature and quality of the recent 100% transaction.  Preston Hollow contends that while it is a 100% placement, it is "not a real deal" because it was only given to them after being shown to "every single [investor]."  Trial Tr. 437:15–438:12 (Weiner).

[175] *E.g.* Challis Dep. at 127:18–128:3.

[176] Davern Dep. at 192:10–22, 193:13–18; *see also* JX 198.

began to enforce an informal preexisting policy not to originate 100% placements.[177] In February, Stifel explained this policy to Preston Hollow.[178] The evidence suggests that the choice to enforce this policy was due, at least in part, to pressure from Nuveen: the head of Stifel's municipal securities group testified that "since John Miller yelled" at him, Stifel had not "given any exclusive on deals we control."[179] In 2019, Stifel has not offered 100% placements to Preston Hollow, but it has completed 100% placements that Preston Hollow originates.[180]

### 10. Wells Fargo

Prior to December 2018, Wells Fargo had completed one 100% placement with Preston Hollow, the Roosevelt University transaction.[181] Internal emails suggest Wells Fargo foresaw backlash from Nuveen over the deal.[182] After the deal closed in October 2018, Nuveen put Wells Fargo in the box for failing to offer the

---

[177] Czajkowski Dep. at 15:22–17:2, 17:16–18:11.

[178] *Id.* at 73:2–25.

[179] JX 430; Czajkowski Dep. at 64:10–65:24.

[180] Trial Tr. 441:3–442:10 (Weiner); *see also* JX 429 (Stifel representative noting, "I don't think [anyone] will [be] able [to] block Preston from getting deals where they have done both sides… they will find dealers to execute that trade.").

[181] Trial Tr. 392:16–19 (Davern); *see also* JX 974.

[182] *See* JX 184, at 1 (Wells Fargo stating in internal email, "[t]his would be considered salt in the wound from a Nuveen perspective . . . Lesson learned is there are relationship costs to having an exclusive with one buyer. Smaller transactions it is more understandable but larger ones need a wider audience for a variety of reasons.").

issuance on the public market.[183] Miller testified that Nuveen "stopped doing business with Wells Fargo for about six weeks" and that Wells Fargo "removed their head of public finance . . . responsible for . . . that deal."[184] Miller met with Wells Fargo in January, 2019, and at that time Wells Fargo agreed it would change its process so that Nuveen saw every deal, at which time business between Nuveen and Wells Fargo resumed.[185] Wells Fargo continues to do 100% placements with Preston Hollow.[186]

*D. Preston Hollow's Response*

On January 15, 2019, Preston Hollow sent Nuveen a cease-and-desist letter.[187] The letter demanded that Nuveen stop its allegedly unlawful and tortious communication, conduct an internal investigation, share the findings with Preston Hollow, remediate the alleged harm, and adopt new supervisory procedures.[188] On February 22, 2019, just over a month later, Nuveen's General Counsel sent a letter (the "Response Letter") to each of the legal departments at the firms Preston Hollow

---

[183] Trial Tr. 152:9–153:5 (Hlavin), 283:12–19 (Miller); JX 310R, at 4:15–7:16; Davern Dep. at 204:21–209:15; Markeiwicz Dep. at 82:8–21. Miller described Wells Fargo's box as "kind of a minor softer version" of the box. Miller Dep. at 287:22–288:7.

[184] Trial Tr. 285:17–23 (Miller); JX 310R, at 4:15–22. Miller testified at his deposition, however, that business with Wells Fargo was merely "diminished" and that Nuveen "continued to do business with [Wells Fargo] as a whole." Miller Dep. at 162:17–163:2.

[185] Miller Dep. at 173:18–174:12; Markiewicz Dep. at 110:17–114:11.

[186] Albarran Dep. at 60:17–61:10; JX 740, at 1, 4, 15, 26; Weiner Dep. at 147:18–148:12.

[187] PTO, ¶ 29.

[188] *Id.*

identified as having received threats from Miller and his team.[189]  The Response

Letter read, in pertinent part:

> Nuveen does not and will not seek any agreement or commitment from your firm concerning the counterparties it does business with.  We fully acknowledge your firm is free to conduct its trading business in a manner and with firms and counterparties of your choosing . . . With respect to [Preston Hollow] specifically, and for the avoidance of doubt, Nuveen seeks no agreement or commitment from your firm regarding [Preston Hollow] . . . of course, Nuveen reserves the right to conduct its trading business with firms within its lawful discretion and to hold and express its views and judgments in pursuing its investment advisory and trading activities.[190]

Nuveen's Head of Fixed Income and Equities, Bill Huffman, testified that he instructed the Nuveen team to "stop any activities that they were doing and to stop talking about Preston Hollow."[191]

*E. Procedural Posture*

Preston Hollow filed suit on February 28, 2019.[192]  The Complaint pled four counts: (1) tortious interference with contract; (2) tortious interference with prospective business relations; (3) violation of New York State's Donnelly Antitrust Act; and (4) defamation.[193]  Preston Hollow seeks permanent injunctive relief—it

---

[189] *Id.* ¶ 30.

[190] *Id.*

[191] Trial Tr. 579:4–8 (Huffman).

[192] Verified Compl. for Inj. Relief, Docket Item ("D.I.") 1 ("Compl.").

[193] *Id.*

does not seek damages.[194] Along with its Complaint, Preston Hollow also filed a Motion for Preliminary Injunction and a Motion to Expedite.[195] I granted the Motion to Expedite and denied preliminary injunctive relief on March 14, 2019.[196]

On May 14, 2019, I granted the Defendants' Motion to Dismiss Count I for tortious interference with contract.[197] At that time, I directed the parties to proceed to trial in July on the request for permanent injunctive relief, and trial on Counts II and III was held on July 29–30, 2019. On August 13, 2019, I issued an Opinion granting the Defendants' Motion to Dismiss Count IV for defamation.[198] On September 16, 2019, I heard post-trial argument. I suspended consideration of the remaining issues on December 13, 2019, to allow the parties to discuss settlement at my recommendation.[199] When the parties informed me on January 8, 2020 that these negotiations had ultimately failed, I considered the matter fully submitted. This

---

[194] PTO, ¶¶ 14–15.

[195] Pl. Mot. to Expedite, D.I. 3; Pl.'s Mot. for Preliminary Inj., D.I. 4.

[196] Tr. of the Telephonic Oral Argument of Pl.'s Mot. to Expedite and Ruling of the Court, D.I. 73.

[197] Telephonic Partial Rulings of the Court on Defs.' Mot. to Dismiss, D.I. 192.

[198] *Preston Hollow Capital LLC v. Nuveen LLC*, 216 A.3d 1 (Del. Ch. 2019). On October 11, 2019, I approved Plaintiff's election to transfer the defamation count to the Complex Commercial Litigation Division in the Delaware Superior Court. Order Granting Pl.'s Election to Transfer Proceedings, D.I. 399.

[199] Dec. 13, 2019 - Telephonic Rulings of the Court on Defs.' Mot. to Reopen and Supplement the Trial Record, D.I. 411.

post-trial Memorandum Opinion concerns Count II for tortious interference with business relations and Count III for violations of New York's Donnelly Act.

## II. ANALYSIS

*A. Nuveen is Liable for Tortious Interference with Business Relations*

Under Delaware law, the elements of tortious interference with business relations are: (1) reasonable probability of business opportunity; (2) intentional interference by defendant with that business opportunity; (3) proximate causation; and (4) damages.[200] The tort is unusual, in that its application, even if these elements are met, is circumscribed by consideration of competing rights. Thus, the elements of the tort must be considered in light of a defendant's privilege to compete in a lawful manner.[201] The tort may implicate free speech rights as well; that is to say, a person may be permitted to air a grievance or state an opinion, which may have the effect of harming another's business relationship, but which does not amount to tortious interference.[202] Tortious interference with a business relationship, I note, does not require an existing contract between the parties.[203]

---

[200] *Agilent Techs., Inc. v. Kirkland*, 2009 WL 119865, at *5 (Del. Ch. Jan. 20, 2009) (citing *DeBonaventura v. Nationwide Mut. Ins. Co.*, 419 A.2d 942, 947 (Del. Ch. 1980)); *Beard Research, Inc. v. Kates*, 8 A.3d 573, 608 (Del. Ch. 2010), *aff'd sub nom. ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749 (Del. 2010).

[201] *Agilent*, 2009 WL 119865, *5; *Beard*, 8 A.3d at 608.

[202] *Bove v. Goldenberg*, 2007 WL 446014, at *4 (Del. Super. Feb. 7, 2007).

[203] *Id.*

## 1. Preston Hollow Had a Reasonable Probability of Business Opportunity

A reasonable probability of a business opportunity requires showing "something more than a mere hope or the innate optimism of the salesman" or "mere perception of a prospective business relationship."[204] Our courts reject "vague statements about unknown customers,"[205] allegations of "a nebulous, unascertainable class of business relationships," or speculative prospects.[206] Instead, to succeed, Preston Hollow must show a "bona fide expectancy" of opportunity.[207] Meeting this standard requires Preston Hollow to "identify a specific party who was prepared to enter into a business relationship but was dissuaded from doing so by the defendant."[208]

In determining whether a business opportunity constitutes a bona fide expectancy, this Court makes a factual inquiry into the reasonableness of the expectation. On the one hand, in *Dionisi v. DeCampli*,[209] the Court found the

---

[204] *Agilent*, 2009 WL 119865, at *7.

[205] *Id.*

[206] *Organovo Holdings, Inc. v. Dimitrov*, 162 A.3d 102, 122 (Del. Ch. 2017) (internal citations omitted). For example, in the case Nuveen cites, the Superior Court rejected business expectancy because the plaintiff's hopes were contingent upon one of its business partner's new business models succeeding. *Kable Products Services, Inc. v. TNG GP*, 2017 WL 2558270, at *10 (Del. Super. June 13, 2017). Such a tenuous expectancy was too speculative. *Id.*

[207] *Kable Prods.*, 2017 WL 2558270, at *10 n.84.

[208] *Organovo*, 162 A.3d at 122 (internal quotations omitted) (citing *Agilent*, 2009 WL 119865, at *7).

[209] 1995 WL 398536 (Del. Ch. June 28, 1995).

34

business relationship too informal and inconsistent to create a "realistic" expectancy of future contractual relations.[210] In that case, the highly-discretionary, one-off nature of the business the plaintiff (a small, independent graphic designer) had received in the past from its client (a corporate giant) failed to form a bona fide expectancy.[211] On the other hand, in *Beard Research Inc. v. Kates*,[212] long-standing customer relationships were found to give the plaintiff a "reasonable probability of obtaining repeat business," even without contemplating specific transactions.[213] The customers' satisfaction and consistency, combined with the plaintiff's unique position in the market, meant it "reasonably could have expected its one-off and catalog customers to continue using its services."[214] In sum, whether a business opportunity creates a bona fide expectancy is a factual inquiry evaluating the reasonableness of the expectation.

I find that Preston Hollow had a reasonable expectation of business opportunity with Deutsche as well as with each of the broker-dealers discussed above with the exceptions of BAML and RBC. First, concerning Deutsche, Preston

---

[210] *Id.* at *13 (finding plaintiff "failed to prove [it] had either an actual contractual relationship entitling [it] to additional work with its clients or a realistic expectancy that its clients would hire [it] again.").

[211] *Id.*

[212] 8 A.3d 573 (Del. Ch. 2010), *aff'd* 11 A.3d 749 (Del. 2010).

[213] *Id. at* 611.

[214] *Id.*

Hollow had a formalized relationship that included contractual renewals of its TOB financing, creating a reasonable expectancy.[215]  Second, Preston Hollow had transactions in the works with several broker-dealers at the time of Nuveen's actions. Its relationship with Goldman, while not formalized, involved twelve identified potential transactions, Goldman's interest in the Howard Quad transaction, and its confirmation that Preston Hollow was a part of its business plan.[216]  Discussing a dozen potential transactions with a named business partner, in this context, creates a business expectancy.  Preston Hollow also had named transactions underway with Mesirow and Morgan.[217]  Third, Preston Hollow received interest and entered into discussions with Goldman and JPMorgan regarding the possibility of underwriting the Howard Quad transaction.[218]  These discussions and inquiries for an

---

[215] JX 509, at 1–2; Trial Tr. 430:10–13 (Weiner), 356:12–257:3 (Van Den Handel).

[216] Trial Tr. 477:9–23 (Scruggs) (Goldman representative testifying, "Q: And was [Goldman] interested at that time in potentially serving as the underwriter for the Howard Center Transaction? A: [Y]es, we were"), 20:1–18 (Thompson) (Preston Hollow testifying, "In December [2018] we were working on, give or take, a dozen things in various stages of development."), 422:8–18 (Weiner), 94:22–95:10 (Albarran) (Preston Hollow testifying, "[Goldman] was also introducing us to the investment bankers that . . . [they] thought would have clients that would need the type of investments and services that we could provide"); Scruggs Dep. at 64:20–25 (Goldman representative testifying, "[w]e are actively engaged with [Preston Hollow] on multiple potential projects and they represent a portion of our continued business plan.").  Nuveen argues that these transactions with Goldman should be excluded for untimely disclosure.  I do not find that Nuveen was prejudiced.  The deals were discussed by Goldman's representative at his deposition, and Preston Hollow did not fail to allege business relations with Goldman.

[217] Trial Tr. 20:19–21:5 (Thompson), 418:17–419:9, 424:21–425:7 (Weiner); Haskel Dep. at 50:3–22.

[218] JX 217, at 1; JX 224; Scruggs Dep. at 101:2–10; Trial Tr. 482:5–19 (Scruggs).

underwriting contract are not too speculative to support a reasonable expectation of future business.

Regarding the remaining five broker-dealers for whom no specific transactions were identified—BAML, KeyBanc, RBC, Stifel, and Wells Fargo—Nuveen contends the lack of named deals translates to a lack of business expectancy. I disagree in part. Preston Hollow had completed several 100% placement deals in the past with both KeyBanc and Stifel, making these two broker-dealers its most frequent partners for this type of transaction.[219] Similarly, Wells Fargo served as underwriter for the Roosevelt University transaction. All three continue to do 100% placements that Preston Hollow originates.[220] The strength and consistency of these relationships creates a reasonable expectation in this case.

By contrast, Preston Hollow's history with BAML and RBC does not evince the same type of relationship. Business relations with RBC appeared to be in decline.[221] Following the single 100% placement completed with BAML—the Howard Center transaction—Preston Hollow attempted to switch underwriters for

---

[219] *See* Weiner Dep. at 90:18–25, 105:6–15, 106:11–18; Levin Dep. at 161:23–162:5; Challis Dep. at 127:18–128:3.

[220] Trial Tr. 425:8–21, 441:3–442:10, 443:11–16 (Weiner); Czajkowski Dep. at 41:2–42:25, 64:10–65:24, 71:2–73:25; JX 430; JX 421.

[221] *See* JX 740, at 1.

the follow-on Howard Quad transaction.[222] These declining or one-off relationships do not show a reasonable expectation of business opportunity. In sum, I find that Preston Hollow had a business expectancy with regard to Deutsche and each of the broker-dealers except for BAML and RBC.

### 2. Nuveen Intentionally Interfered with Preston Hollow's Business Opportunities

The second prong of the tort asks whether Nuveen *intentionally* interfered with Preston Hollow's business expectations.[223] Nuveen argues that there is no intentional interference because Nuveen was targeting the 100% placement model, which it considers harmful, and not Preston Hollow.[224] Nuveen called Deutsche and Morgan on December 20, 2018 and Goldman on December 21, 2018.[225] Its employees testified at trial that their intention on these phone calls was merely to curtail a harmful trend in the industry. According to their testimony, referencing "Preston Hollow" was not intended to identify that entity in particular. Instead, it was only a "shortcut" for talking about 100% placements, and the phone calls had

---

[222] *See* JX 484, at 2 (Preston Hollow stating in email to JPMorgan, "[f]rankly, the BAML banker was a difficult person and we are suggesting a change").

[223] Nuveen, along with some Delaware case law, elides the second prong of the tort with the privilege to compete and deals with the propriety of the interference at this stage. *See*, *e.g. Kable Prod. Servs., Inc. v. TNG GP*, 2017 WL 2558270, at *11 (Del. Super. June 13, 2017); *Agilent Techs., Inc. v. Kirkland*, 2009 WL 119865, at *8 (Del. Ch. Jan. 20, 2009). For clarity's sake, I deal with the wrongfulness aspects separately below.

[224] *E.g.* Trial Tr. 184:23–185:6 (Hlavin), 248:4–12 (Miller).

[225] PTO, ¶¶ 20–27.

little or nothing to do with Preston Hollow beyond the fact that it performed this type of transaction.[226] I found this testimony both self-serving and disingenuous. I find that the Nuveen personnel meant what they said. These communications evidence a common theme: Nuveen called broker-dealers and told them to stop doing business with Preston Hollow or face consequences—including being put "in the box" and losing their business with Nuveen. This activity, which Preston Hollow aptly characterizes as a campaign, demonstrates an intent to interfere.

Not all of Nuveen's efforts were memorialized in recordings. Miller called JPMorgan around December 20, 2018 and met with Wells Fargo in January 2019. Davern called KeyBanc in April 2018 and met with Stifel in October 2018.[227] Hlavin contacted Mesirow prior to its closing the Hutto transactions.[228] While these communications were not recorded, the evidence leads me to believe they were part of the same pattern of conduct intended to end these broker-dealers' relationships with Preston Hollow. Nuveen itself corroborates this conclusion: it told Deutsche that it was "going to every single bank and broker-dealer" and that "the policy going forward is that . . . if you are actively doing business with [Preston Hollow], Nuveen

---

[226] Davern testified that she "said 'Preston Hollow,' but it could have been BlackRock or Vanguard or anyone else." Trial Tr. 360:5–8 (Davern). Likewise, Miller and Hlavin both testified that "Preston Hollow" was a shortcut for "one-hundred percent placements." Trial Tr. 184:23–185:6 (Hlavin), 248:4–12 (Miller).

[227] PTO, ¶ 20; Moriarty Dep. at 40:4–19.

[228] *See* JX 393R, at 2:17–4:7.

will not be doing business with you."[229]  Miller named some of these broker-dealers specifically, claiming he had a "firm commitment" from JPMorgan and Wells Fargo (the two broker-dealers he contacted in December 2018 and January 2019) not to do business with Preston Hollow.[230]  Davern told Morgan that Nuveen was "building a book of dealers" that would refuse to do business with Preston Hollow.[231]  After hearing Nuveen's testimony, I can conclude that the meetings and phone calls that went unrecorded were cut from the same cloth and demonstrate a specific intent to disrupt the relationships between broker-dealers and Preston Hollow.  Therefore, I find intentional interference with relation to Deutsche and all remaining broker-dealers.

### 3. Nuveen's Interference Proximately Caused Preston Hollow Harm

"In Delaware, proximate cause is that direct cause without which the incident would not have happened."[232]  In disputing causation, Nuveen points out that the broker-dealers offer explanations for their increasing distance from Preston Hollow. These explanations may be true, but they do not rebut causation because Nuveen

---

[229] JX 263R, at 24:21–25:2.

[230] JX 310R, at 4:15–5:7.

[231] JX 277, at 2:19–3:11, 4:21–5:6.

[232] *Beard Research, Inc. v. Kates*, 8 A.3d 573, 609 (Del. Ch. 2010), *aff'd sub nom. ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749 (Del. 2010).

motivated these changes in policy and business behavior. I find causation exists for Goldman, JPMorgan, KeyBanc, Mesirow, Stifel, and Wells Fargo.

Goldman was in discussions regarding twelve deals with Preston Hollow.[233] After phone calls from Nuveen, internal reviews of "boundaries" and "matrixes" arose, and business with Preston Hollow evaporated.[234] Goldman's deal "matrix" may be genuine; the point is that Nuveen motivated its creation.[235] The story repeats with JPMorgan. In November 2018, JPMorgan inquired about underwriting the Howard Quad transaction.[236] Then, just before Christmas, it had discussions with Miller about 100% placements, and soon after, an internal approval process arose that kept it from engaging in the deal for which it had recently asked to be considered.[237] Similarly, with KeyBanc, Davern called in April 2018 and put it "in the box" and withdrew business as a result of its involvement with Preston Hollow.[238] Afterward, it committed to show Nuveen every deal and stopped originating 100% placements for Preston Hollow.[239] Mesirow was working with

---

[233] Trial Tr. 477:9–23 (Scruggs), 20:1–18 (Thompson), 94:22–96:6 (Albarran), 422:8–18 (Weiner); Scruggs Dep. at 55:25–58:21.

[234] Scruggs Dep. at 41:16–45:23.

[235] Trial Tr. 485:14–24 (Scruggs).

[236] JX 217, at 1.

[237] O'Loughlin Dep. at 36:9–14; JX 484, at 1–2. JPMorgan also cited concerns of interfering with its relationship with BAML. JX 484, at 1–2.

[238] Moriarty Dep. at 40:4–19; JX 123.

[239] Moriarty Dep. at 56:18–59:6.

Preston Hollow on the five Hutto transactions, but at the last minute, Mesirow introduced terms that got it fired from the first of the Hutto deals, and it has not completed any since.[240] Hlavin told Deutsche he "blocked" the "fire dirt deals" out of Texas, which matches the Hutto transactions.[241] Davern met with Stifel representatives in October 2018 and Miller also contacted them, after which Stifel enforced a policy under which it stopped originating 100% placements for Preston Hollow.[242] After a fallout from the Roosevelt deal, Miller met with Wells Fargo in January 2019, and it agreed not to commit to 100% placements without showing Nuveen the deals first.[243]

These interferences tell a repeated story: Nuveen went to the broker-dealers and gave them a clear message, and in response the broker-dealers took actions that curtailed the business expectancies of Preston Hollow. The record shows that when broker-dealers introduced or began enforcing pre-existing policies effectively prohibiting the origination of 100% placements, these policies and their enforcement were in response to Nuveen's threats.

---

[240] Trial Tr. 445:13–23, 424:21–425:7, 418:17–419:9 (Weiner), 20:19–21:5 (Thompson).

[241] JX 393R, at 2:14–3:6.

[242] Davern Dep. at 192:10–22, 193:13–18; Czajkowski Dep. at 64:10–65:24; JX 430.

[243] Miller Dep. at 173:18–174:12; Markiewicz Dep. at 110:17–114:11.

By contrast, I find no causation regarding Deutsche or Morgan. Deutsche did not reduce its business with Preston Hollow.[244] While Preston Hollow contends that Nuveen's threat is ongoing, I see no indication that Deutsche is merely performing under the Court's scrutiny.[245] The record demonstrates a firm dedication by Deutsche to continue working with Preston Hollow.[246] Regarding Morgan, it appears that the Rixey transaction failed to go forward for reasons specific to Preston Hollow and unrelated to Nuveen.[247]

### 4. Preston Hollow has Demonstrated Harm

I am left to evaluate harm on the following business expectancies: Goldman, JPMorgan, KeyBanc, Mesirow, Stifel, and Wells Fargo. I find resulting damage to all six business relations.

Goldman and JPMorgan were potential underwriters for the Howard Quad transaction, but they withdrew. Nuveen argues this did not cause harm because Preston Hollow closed the deal with another underwriter, Loop Capital, without changing any terms. Preston Hollow, in turn, argues that the use of a non-bulge bracket underwriter (i.e. not among the top echelon) hurts its ability to move the

---

[244] Trial Tr. 355:14–24 (Van Den Handel).

[245] *Id.* at 356:12–257:3 (Van Den Handel); JX 509, at 1–2.

[246] Because I find no causation or damages regarding Deutsche, I do not address Nuveen's argument regarding its concern over TOB counterparty risk described in its briefing.

[247] *See* Haskel Dep. at 56:8–20, 107:11–108:7.

bonds in the secondary market.[248]  A top-tier underwriter gives its stamp of approval to a transaction by underwriting the deal, which can enhance the marketability of the bonds.[249]  Obtaining the desired terms, therefore, while being shut out from selecting previously interested bulge-bracket underwriters demonstrates harm resulted from the interference.[250]

Further, Preston Hollow was developing a book of business with Goldman but is now shut out.  The deals were in varying nascent stages, but it demonstrates harm because it prevented Preston Hollow's developing any of these potential projects with one of the most important broker-dealers in the field.  Regarding KeyBanc and Stifel, Preston Hollow suffered harm because both these broker-dealers ceased to originate 100% placements.  Both continue to do business with Preston Hollow—

---

[248] Trial Tr. 117:19–118:9, 131:16–132:14 (Albarran), 474:21–475:18 (Weiner).

[249] *Id.* at 51:12–53:12 (Metzold) (testifying that "when you have a top-tier underwriter's name on the documents, it's sort of that good housekeeping seal of approval . . . it makes [the bond] a lot easier to sell, certainly in the primary market, and very much so in the secondary market, because people assume that the necessary diligence has been performed.").

[250] Nuveen filed a pre-trial Motion *in Limine* that sought to exclude, among many other things, Metzold's testimony on this subject of harm based on preclusion from top-tier underwriters, claiming that it represented a new theory of harm not outlined in his expert report.  After reviewing the evidence, the expert report, and the trial testimony, I do not find that Metzold's testimony regarding this issue should be excluded or that it presented a "new theory" of harm such that the evidence prejudiced Nuveen.  In Metzold's expert report, he stated, "I believe that Nuveen's actions will significantly harm Preston Hollow.  Without the flow of deals and liquidity financing from the largest dealers, Preston Hollow's business would decline and suffer dramatically."  Defs.' Mot. In Limine to Exclude Certain Expert Testimony of Thomas Metzold, D.I. 318, Ex. A, Expert Report of Thomas Metzold ("Metzold Report"), at 15.  At his deposition, Metzold expanded on this harm, explaining the value of top-tier underwriters, i.e. the "largest dealers."  Metzold Dep. at 188:25–192:2.  He testified to this same issue at trial, offering Nuveen the chance to cross-examine him on this aspect of his opinion regarding harm to Preston Hollow.

44

including 100% placements—but Preston Hollow's relationship has been harmed because it no longer receives 100% placements brought to the table by these two broker-dealers. Regarding Mesirow, Preston Hollow found other underwriters and has closed some of the Hutto deals, while others remain underway.[251] Nonetheless, I find harm because Preston Hollow was forced to fire Mesirow as an underwriter and seek an alternative at the last minute, which delayed the transactions. Finally, Wells Fargo continues to do business with Preston Hollow, but after the Roosevelt Transaction, it will only conduct 100% placements following a "first look" by Nuveen. This practice harms Preston Hollow because it prevents access to the exclusivity that makes 100% placements valuable to its business model.

> 5. Nuveen's Actions do not Fall in the Business Competition Exception

As noted above, claims for tortious interference with business relations must be examined in light of the privilege to compete in a lawful manner.[252] Delaware follows the Restatement (Second) of Torts (the "Restatement") regarding the privilege to compete. To excuse liability, § 768 of the Restatement requires that:

> (a) the relation concerns a matter involved in the competition between the actor and the other and (b) the actor does not employ wrongful

---

[251] *See* Albarran 30(b)(6) Dep. 94:11–97:9; 101:8–13; Trial Tr. 449:2–250:1 (Weiner); *see also* JX 938.

[252] *Agilent Techs., Inc. v. Kirkland*, 2009 WL 119865, at *5 (Del. Ch. Jan. 20, 2009) (citing *DeBonaventura v. Nationwide Mut. Ins. Co.*, 419 A.2d 942, 947 (Del. Ch. 1980)); *Beard Research, Inc. v. Kates*, 8 A.3d 573, 608 (Del. Ch. 2010), *aff'd sub nom. ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749 (Del. 2010).

means and (c) his action does not create or continue an unlawful restraint of trade and (d) his purpose is at least in part to advance his interest in competing with the other.[253]

Before I excuse Nuveen under this analysis, I must find that all four factors are met. I focus on the second requirement, the employment of wrongful means. Because I find that Nuveen employed wrongful means in competing with Preston Hollow, I do not address the other elements.

A finding of wrongfulness, in turn, must be based on a seven-part test outlined in § 767 of the Restatement. This balancing tests asks me to weigh (1) the nature of Nuveen's conduct, (2) Nuveen's motive, (3) Preston Hollow's interests with which Nuveen interfered, (4) the interests Nuveen sought to advance, (5) social interests in protecting freedom of action versus contractual interests, (6) proximity of Nuveen's conduct to the interference, and (7) the relationship between Nuveen and Preston Hollow.[254] The chief factor in this analysis is the nature of the actor's conduct because this cuts to the heart of whether wrongful means were employed.[255] Section 767 lists several wrongful means, of which I find two obtain: misrepresentation and economic pressure.

---

[253] Restatement (Second) of Torts (1979) ("Restatement"), § 768.

[254] *Id.* § 767.

[255] *Id.* § 767 cmt. c. ("The nature of the actor's conduct is a chief factor in determining whether the conduct is improper or not").

### a. Nuveen's Misrepresentations to Goldman

According to the Restatement, "[f]raudulent misrepresentations . . . make an interference improper."[256] To prove fraudulent intent, "a misrepresentation must be made either knowingly, intentionally, or with reckless indifference to the truth."[257] Nuveen's phone calls with Deutsche, Goldman, Morgan, and RBC were recorded, but of these third-parties, I have found tortious interference only with relation to Goldman, and so I consider only the statements made to Goldman.

Some of Nuveen's statements, such as stating that Preston Hollow had "predatory" lending practices and sales pitches, may or may not be opinions. I need not resolve this issue. Nuveen told Goldman that Preston Hollow lied to issuers, and it promised it had evidence to support this allegation when it had only rumors from the trading desk.[258] This amounts to a reckless indifference to the truth. Similarly, allegations that Preston Hollow's "unethical practices" had "caught the attention of the states' attorney generals" who sent "nastygrams," was a misrepresentation of the "evidence" Miller actually possessed: a single letter from a single city attorney.[259] Miller's testimony that this lie was "a little bit of a shortcut" does not keep it from

---

[256] *Id.*

[257] *Metro Comm'n Corp. BVI v. Advanced Mobilecomm Tech.*, 854 A.2d 121, 143 (Del. Ch. 2004).

[258] JX 267R, at 19:10–16, 42:3–4; Trial Tr. 263:2–266:16 (Miller).

[259] Trial Tr. 270:1–272:14 (Miller).

constituting a knowing misrepresentation intended to interfere with Preston Hollow's business.

### b. Nuveen's Improper Economic Pressure

A party loses its privilege to compete if it exerts improper economic pressure.[260] The commentary on § 767 of the Restatement makes it clear that the propriety of economic pressure is a contextual inquiry: there is no "crystallized set of definite rules," and the "decision therefore depends upon a judgment and choice of values in each situation."[261] Determining whether economic pressure is improper requires examining

> the circumstances in which it is exerted, the object sought to be accomplished by the actor, the degree of coercion involved, the extent of the harm that it threatens, the effect upon the neutral parties drawn into the situation, the effects upon competition, and the general reasonableness and appropriateness of this pressure as a means of accomplishing the actor's objective.[262]

---

[260] Nuveen argues that for economic pressure to be wrongful, it must be "extreme," but this is not the standard either in the Restatement or in Delaware law. The case Nuveen cites analyzes tortious interference with prospective business advantage under New York law. *Raytheon Co. v. BAE Sys. Tech. Solutions & Servs. Inc.*, 2017 WL 5075376, at *13 (Del. Super. Oct. 30, 2017) ("New York allows a party to demonstrate 'unlawful means' through an independent tort, or extreme and unfair economic pressure."). Nuveen also cites § 766B of the Restatement, but this section does not impose a requirement that economic pressure be "extreme." *See* Restatement, § 766B.

[261] Restatement, § 767 cmt. b. ("[T]his branch of tort law has not developed a crystallized set of definite rules as to the existence or non-existence of a privilege to act . . . The issue in each case is whether the interference is improper or not under the circumstances; whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another. The decision therefore depends upon a judgment and choice of values in each situation.").

[262] *Id.* § 767 cmt. c.

Expanding further on the analysis, § 768, comment e of the Restatement permits a defendant to "exert limited economic pressure."[263] As long as a party avoids an illegal restraint on trade, "he may refuse to deal with the third persons in the business in which he competes with the competitor if they deal with the competitor" and "he may refuse other business transactions with the third person relating to that business."[264] While such limited choice-of-business-partner pressure is acceptable competition, Delaware law also recognizes that when a defendant intends the interference to drive a competitor out of business and "shut its doors," this constitutes wrongful means, and the conduct is not privileged.[265]

I find that Nuveen exerted improper economic pressure on Preston Hollow. In this instance, it is proper to look at the entire picture to understand the economic pressure applied. In other words, each of Nuveen's interactions with broker-dealers may or may not have risen, individually, to wrongful means, but under the Restatement, I consider the context as a whole to determine the propriety of Nuveen's pressure.[266] 100% placements comprise the majority of Preston Hollow's

---

[263] *Id.* § 768 cmt. e.

[264] *Id.*

[265] *See Beard Research, Inc. v. Kates*, 8 A.3d 573, 611–12 (Del. Ch. 2010), *aff'd sub nom. ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749 (Del. 2010).

[266] Restatement, § 767 cmt. b. ("The issue in each case is whether the interference is improper or not under the circumstances; whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another. The decision therefore depends upon a judgment and choice of values in each situation.").

business.[267]  Davern informed Morgan that Nuveen was attempting to make the prohibition on 100% placements "uniform across [Wall Street]."[268]  Miller informed Deutsche and Goldman that he had agreements with many of the major broker-dealers not only to cease 100% placements, but to cut off Preston Hollow entirely, and that he was seeking more of these agreements.[269]  Nuveen made it clear that there would be punitive measures absent capitulation: Davern told Morgan and RBC that Nuveen had "straightened out" or "turned around" noncompliant broker-dealers.[270]  Further, the record shows that part of Miller's aim was to cut off Preston Hollow's financing.[271]  The record, taken as a whole, shows consistent, systematic efforts by Nuveen to shut down Preston Hollow's ability to continue to do business.

Again, communications with each of the individual broker-dealers may evince limited—that is, non-tortious—economic pressure; the choice to refrain from

---

[267] Trial Tr. 28:2–22 (Thompson) (testifying that Preston Hollow does "[m]ostly primary" bond issuances and only "[o]ccasionally" purchases something less than 100% of the issuance), 439:20–440:12 (Weiner) (testifying that "100 percent placement transactions . . . is almost all of our business.").

[268] JX 299R, at 10:20–11:11.

[269] JX 310R, at 4:15–5:7; JX 267R, at 33:23–34:3.

[270] JX 299R, at 4:13–22, 10:20–11:11; JX 396R, at 2:4–12; 5:13–20.

[271] *See* JX 310R, at 11:5–12:20 (Miller stating in phone call, "who else are they going to get financing from when Wells Fargo, Goldman, JPMorgan, BAML, and Citi have . . . agreed to – to not do this business anymore?  I don't know where they're going to get the financing from."), 17:13–16 ("But where are they getting the money to do the predatory lending?  I think you're – I think you're far and away number one"), 21:9–13 ("some of these dirty deals are going to become less financeable, in my opinion.  That's my effort.  That's my goal, one of my goals, just so you know."); *see also* Van Den Handel Dep. 43:15–47:4, 72:9-73:11.

business with a third-party who conducts business with a competitor. The facts revealed in litigation, however, show that as Preston Hollow was becoming a contender in the high-yield municipal bond market, Nuveen, the self-styled "largest high-yield [municipal] fund in the world,"[272] sought an industry-wide agreement not to conduct business with Preston Hollow. Although part of Nuveen's motive was its interest in "seeing all the deals," its behavior shows that its object was also an attack directed at Preston Hollow's ability to operate. The evidence demonstrated an aggressive and widely dispersed campaign to use almost any pressure necessary to cut off a competitor from its chief source of business as well as its financing. I find that Nuveen was not simply attempting to achieve a competitive edge; it meant to use the leverage resulting from its size in the market to destroy Preston Hollow. Considering the context as a whole, as the Restatement urges, I find that Nuveen exerted improper economic pressure on Preston Hollow, and so its actions regarding Goldman, JPMorgan, KeyBanc, Mesirow, Stifel, and Wells Fargo were not privileged by its right to lawfully compete. Therefore, Nuveen is liable for tortious interference with business relations.

---

[272] Trial Tr. 237:7–9 (Miller); JX 263, at 17:24–18:1.

*B. New York State's Donnelly Act*

In its third count, Preston Hollow claims Nuveen violated New York State's Donnelly Act of 1899 (the "Donnelly Act").[273]  Preston Hollow argues that Nuveen organized a boycott among broker-dealers (many of whom are based in New York) that constitutes an illegal restraint on trade in that state.  After review of the applicable statutes and case law, I decline to rule on this count, as I believe it would constitute an imprudent determination of New York law when it is unclear whether New York law would permit Preston Hollow's claim seeking injunctive relief.

The law on the availability of injunctive relief to private parties under the Donnelly Act is limited and conflicted.[274]  At least one New York decision found such private party relief unavailable under the Donnelly Act.[275]  On its face, the statute permits only the *attorney general* to seek injunctive relief.[276]  Preston Hollow argues that this is largely irrelevant because "[t]he Donnelly Act was modelled on the Federal Sherman Act of 1890," and therefore it should "generally be construed

---

[273] N.Y. Gen. Bus. Law §§ 340–47.

[274] *Compare Peekskill Theater v. Advance Theatrical Co. of N.Y.*, 206 A.D. 138 (N.Y. App. Div. 1923) (New York appellate court granting injunction to private litigant without analyzing the permissibility under the statute) *with Blumenthal v. Am. Soc'y of Travel Agents, Inc.*, 1977 WL 18392, at *4 (N.Y. Sup. Ct. July 5, 1977) (New York trial court analyzing the statute and denying injunctive relief to private litigant without addressing *Peekskill* precedent).

[275] *Blumenthal*, 1977 WL 18392, at *4.

[276] N.Y. Gen. Bus. Law § 342 ("The attorney-general may bring an action in the name and in behalf of the people of the state against any [party] to restrain and prevent the doing in this state of any act herein declared to be illegal.").

in light of Federal precedent and given a different interpretation only where State policy, differences in the statutory language or the legislative history justify such a result."[277]   However, this argument is undermined by a close look at the statutory background, starting with the Sherman Act of 1890.[278]   Under the Sherman Act, equitable relief was only available to the United States Attorney General.[279]   In 1914, Congress added the Clayton Act,[280] expressly extending equitable relief under the Sherman Act to private parties.[281]   The Donnelly Act is modeled after the Sherman Act, but it *has not* been supplemented with an analogous Clayton Act.   Therefore, "differences in the statutory language or the legislative history" suggest I ought not bypass the conflicting New York law to follow federal precedent.

---

[277] *People v. Rattenni*, 81 N.Y.2d 166, 171 (N.Y. 1993); *see also Anheuser-Busch, Inc. v. Abrams*, 71 N.Y.2d 327, 334 (N.Y. 1988).

[278] 15 U.S.C. §§ 1–11.

[279] 15 U.S.C. § 4 ("[I]t shall be the duty of the several United States attorneys, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations.").

[280] 15 U.S.C. §§ 12–27.

[281] 15 U.S.C. § 26 ("Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws . . ."). Federal case law appears to corroborate that injunctive relief became a private remedy after the addition of the Clayton Act. *Compare State of Minnesota v. N. Sec. Co.*, 194 U.S. 48, 71 (1904) ("taking all the sections of [the Sherman Act] together, we think that its intention was to limit direct proceedings in equity . . . to those instituted in the name of the United States, under the 4th section of the act, by district attorneys of the United States, acting under the direction of the Attorney General") *with Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 355 (7th Cir. 1990) (noting that defendant was liable under § 1 of the Sherman Act and equitable relief was granted under § 26 of the Clayton Act).

Delaware has a policy against innovating in sister-states' laws.[282]  Here, granting injunctive relief would determine an ambiguous question of New York law. It would therefore be imprudent under principles of comity to rule on the injunctive relief sought under the Donnelly Act.  "If litigants want innovative common law, they should address their claims to the courts of the state whose law applies."[283] Declining to make a determination on this count moots the issue of Nuveen's liability under the Donnelly Act for the purposes of this litigation.  Therefore, I need not address the substantial issue of whether, in light of the interstate nature of both Nuveen's and Preston Hollow's business, federal law would preclude application of the Donnelly Act here.[284]

*C. Preston Hollow is not Entitled to Permanent Injunctive Relief*

Nuveen has committed a tort; the usual remedy for loss caused by tort is money damages.  Such damages would be available here, had Preston Hollow sought to demonstrate them.  It is quite true that in any case of interference with a business relationship, damages may be difficult to calculate with certainty.  It is equally true

---

[282] *See RBC Capital Markets, LLC v. Educ. Loan Tr. IV*, 2011 WL 6152282, at *6 n.43 (Del. Ch. Dec. 6, 2011) (citing *Viking Pump, Inc. v. Century Indem. Co.*, 2009 WL 3297559, at *25 n.144 (Del. Ch. Oct. 14, 2009)).

[283] *Id.*

[284] Assuming the Donnelly Act did apply, I note that numerous factual issues, not analyzed here, regarding formation of alleged agreements between the broker-dealers and Nuveen to boycott Preston Hollow, as well as the broker-dealers' oversight of one another in furtherance of the alleged boycott, would need to be addressed.

that Preston Hollow bears the burden to demonstrate damages; had it sought damages and utterly failed to prove them, it would have failed in an element of the tort, and would be without a remedy.[285] Nonetheless, it is also true that the burden of proof to create a record on which a court may establish a damage calculation is not high, and is less than for the substantive elements of the tort.[286] Even based on the record here—created in light of Preston Hollow's decision to eschew damages—it seems quite likely the Plaintiff could have created a sufficient ground for a non-speculative damages metric.

However, Preston Hollow expressly *does not* seek damages for its claim of tortious interference; instead, it seeks only equitable relief.[287] It asks this Court to (1) permanently enjoin Nuveen from repeating its tortious behavior, (2) force Nuveen to disavow and repudiate its tortious behavior "and to take all other actions necessary to restore [Preston Hollow]'s right to freely and fairly compete," and (3) direct Nuveen to adopt internal supervisory procedures and policies to prevent future repetition of the tort.[288]

---

[285] *See Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2020 WL 948513 (Del. Ch. Feb. 27, 2020) at *17–20 (finding lack of proof of damages prevents recovery).

[286] *Id.* at *20 (finding that the "quantum of proof required to establish the amount of damage is not as great as that required to establish the fact of damage." (quoting *Total Care Physicians, P.A. v. O'Hara*, 2003 WL 21733023, at *3 (Del. Super. July 10, 2003))); *see also Medicalgorithmics S.A. v. AMI Monitoring, Inc.*, 2016 WL 4401038, at *26 (Del. Ch. Aug. 18, 2016); *Beard Research, Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch. 2010).

[287] Pl. Written Closing Argument, D.I. 372 ("Pl.'s Post-Trial Br."), at 24.

[288] *Id.* at 62.

Equitable relief for tortious behavior is an extraordinary remedy. It is commonly available, however, to prevent ongoing wrong in the context of the interference torts.[289] "The elements for permanent injunctive relief are: (1) actual success on the merits; (2) irreparable harm will be suffered if injunctive relief is not granted; and (3) the harm that will result from a failure to enjoin the actions that threaten plaintiff outweighs the harm that will befall the defendant if an injunction is granted."[290] In determining that Nuveen is liable for tortious interference with business relations, the "merits prong" of the test is met, for the reasons expressed above.

Permanent injunctive relief is usually applied to prevent an ongoing harm; an encroachment on real property, for instance.[291] It is but sparingly applied in the case of a past wrong which a plaintiff apprehends may be repeated.[292] I start with the

---

[289] *See Organovo Holdings, Inc. v. Dimitrov*, 162 A.3d 102, 122 (Del. Ch. 2017) ("[I]injunctive relief is a common and non-controversial remedy for tortious interference with prospective economic advantage." (citing *Copi of Del., Inc. v. Kelly*, 1996 WL 633302, at *4–5 (Del. Ch. Oct. 25, 1996); *Bowl–Mor Co. v. Brunswick Corp.*, 297 A.2d 61, 62 (Del. Ch. 1972) *aff'd*, 297 A.2d 67 (Del. 1972))).

[290] *Sierra Club v. DNREC*, 2006 WL 1716913, at *3 (Del. Ch. June 19, 2006), *aff'd sub nom. Sierra Club v. Delaware Dep't of Nat. Res. & Envtl. Control*, 919 A.2d 547 (Del. 2007).

[291] *E.g. Smith v. Stanphyle Corp.*, 1978 WL 22013, at *1 (Del. Ch. Dec. 13, 1978) (granting permanent injunctive relief to enjoin trespass); *Hammond v. Dutton*, 1978 WL 22451, at *3 (Del. Ch. Dec. 20, 1978) (granting permanent injunctive relief to enjoin trucking operation that constituted private nuisance); *Plantation Park Ass'n, Inc. v. George*, 2007 WL 316391, at *5 (Del. Ch. Jan. 25, 2007) (granting permanent injunctive relief to prohibit defendant's covenant-violative trailer).

[292] *See State ex rel. Brady v. Pettinaro Enters.*, 870 A.2d 513, 536 (Del. Ch. 2005) (denying injunction "on the basis of unsubstantiated fear that a legal duty may be breached in an uncertain future."); *Young v. Red Clay Consol. Sch. Dist.*, 159 A.3d 713, 780 (Del. Ch. 2017) ("A permanent

proposition that equity does not presume future intentional wrongdoing.[293] I presume that Preston Hollow suffered irreparable harm as a result of Nuveen's tortious behavior. Nonetheless, before receiving injunctive relief here, it must demonstrate that it faces a likelihood that Nuveen will repeat its tortious behavior. In light of the facts of record, I find that unlikely. First, I note, upon receiving Preston Hollow's demand that it desist in its disparaging and threatening behavior, Nuveen notified those with whom it had thus communicated as follows:

> Nuveen does not and will not seek any agreement or commitment from your firm concerning the counterparties it does business with. We fully acknowledge your firm is free to conduct its trading business in a manner and with firms and counterparties of your choosing . . . With respect to [Preston Hollow] specifically, and for the avoidance of doubt, Nuveen seeks no agreement or commitment from your firm regarding [Preston Hollow] . . . of course, Nuveen reserves the right to conduct its trading business with firms within its lawful discretion and to hold and express its views and judgments in pursuing its investment advisory and trading activities.[294]

Preston Hollow notes, correctly, that Nuveen retains the right to pursue its own interests, and it reads this as a veiled threat. But even under the relief Preston Hollow

---

injunction against future conduct is not warranted simply because a court has found past conduct illegal.").

[293] *Organovo*, 162 A.3d at 114 (citing *Young v. Red Clay Consol. Sch. Dist.*, 2017 WL 2271390, at *53 (Del. Ch. May 24, 2017); *Christiana Town Ctr., LLC v. New Castle Ctr.*, 2003 WL 21314499, at *3 (Del. Ch. June 6, 2003) ("[T]he court must presume that [parties] will respect any decision rendered by any competent court of this State."); *Reeder v. Del. Dep't of Ins.*, 2006 WL 510067, at *16 (Del. Ch. Feb. 24, 2006) ("There is no justification on this record for an injunction requiring the [defendant] to do what it must do in any event—comply with applicable statutory constraints on its behavior.")).

[294] PTO, ¶ 30.

seeks, Nuveen must also be able to pursue its business interests, to the extent it does not do so tortiously.

Next, I note, Nuveen is not pursuing an ongoing campaign of threats or falsehood, and Preston Hollow does not argue that during the course of this litigation Nuveen has committed further wrongs. Nuveen executive Huffman has directed Nuveen personnel to cease disparaging Preston Hollow going forward.[295] Furthermore, in light of this decision, it would be exceedingly unwise for Nuveen to mount a similar campaign of malicious behavior. Third, the negative relief Preston Hollow seeks—ordering Nuveen to commit bad acts no more (that is, to speak badly of Preston Hollow only where true) would be unusually difficult for the Court to oversee. Finally, both that relief and the positive relief Preston Hollow seeks—forcing Nuveen to write a letter to its contacts that its past behavior was tortious, and promising not to do it again—raise First Amendment issues; and with respect to a *mea culpa* letter, it would add little, I suspect, to the conclusions in this Memorandum Opinion, which, of course, Preston Hollow may circulate as it sees fit.

In order to receive the injunctive relief it seeks, Preston Hollow must show a likelihood of harm absent relief. In other words, it is insufficient to show past harm; for the relief it seeks, Preston Hollow must show that without the injunction, it is

---

[295] Trial Tr. 579:4–8 (Huffman).

58

likely to suffer harm that the injunction could prevent.[296]  I find that Preston Hollow has failed to carry this burden.

It is canonical that equity will not fail to supply a remedy to a wrong.[297]  Here, the remedy available was damages.[298]  Those, the Plaintiff elected to forgo.  If the wrongdoing were ongoing, I would not hesitate to act.  Here, however, the Plaintiff has shown only past tortious behavior; it has not shown a likelihood of future harm absent injunctive relief.  Accordingly, its request for a permanent injunction is denied.

### III. CONCLUSION

For the foregoing reasons, I find Nuveen committed the tort alleged in Count II, tortious interference with business relations.  I decline to rule on Count III, violation of New York State's Donnelly Act.  The Plaintiff has failed to demonstrate entitlement to an injunction.  The Parties should supply an appropriate form of order.

---

[296] *See*, *e.g. McMahon v. New Castle Assocs.*, 532 A.2d 601, 606 (Del. Ch. 1987) (requiring that facts show "a reasonable apprehension of a future wrong" to grant injunction because defendants cannot simply "be enjoined from breaching such duty again.").

[297] *See Weinberger v. UOP, Inc.*, 1985 WL 11546, at *9 (Del. Ch. Jan. 30, 1985), *aff'd*, 497 A.2d 792 (Del. 1985) (TABLE) ("[E]quity will not suffer a wrong without remedy.")

[298] Preston Hollow sought relief for defamation based on Nuveen's behavior at issue here.  I found such relief unavailable in equity.  *Preston Hollow Capital LLC v. Nuveen LLC*, 216 A.3d 1 (Del. Ch. 2019).  Preston Hollow received leave to pursue this action in Superior Court; damages, if appropriate, are available there.